SHELDON P. SHERMAN *et al.*, Derivatively on Behalf of Aon Corporation, Plaintiffs-Appellants, v. PATRICK G. RYAN *et al.*, Defendants-Appellees (Aon Corporation, Nominal Defendant-Appellee).

First District (3rd Division)   No. 1—07—2944

Opinion filed May 20, 2009.—Rehearing denied July 9, 2009.

714

Kenneth A. Wexler, Edward A. Wallace, and Andrae P. Reneau, all of Wesler Toriseva Wallace, LLP, of Chicago, and Robert C. Schubert, Jaden Justice Reed, and William F. Jonckheer, all of Schubert & Reed LLP, of San Francisco, California, for appellants.

Christina M. Techen, David R. Pehlke, and Candace R. Jackson, all of Skadden, Arps, Slate, Meagher & Flom, LLP, of Chicago, for appellees.

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

Plaintiffs, Sheldon P. Sherman, Sally Mathieu, and Andrea Weidhaas, shareholders of Aon Corporation, filed suit derivatively on behalf of Aon Corporation against members of its board of directors, Patrick G. Ryan, Aon's then-chief executive officer, Edgar D. Janotta, Jan Kalff, Lester B. Knight, J. Michael Losh, R. Eden Martin, Andrew J. McKenna, Robert S. Morrison, Richard Notebaert, Michael O'Halleran, John W. Rogers, Carolyn Woo, and Gloria Santona, alleging that the board breached its fiduciary duties by approving a business practice that included contingent-commission agreements. The trial court granted defendants' motion to dismiss plaintiffs' third amended complaint with prejudice. On appeal, plaintiffs contend that the trial court erred in dismissing their complaint because they adequately pled the underlying claims for relief and facts sufficient to excuse demand on the board.

## I. BACKGROUND

Plaintiffs brought a 7-count, 69-page complaint alleging breach of fiduciary duty, gross negligence, breach of contract, waste of corporate assets, unjust enrichment, abuse of control, and gross mismanagement. Because this is an appeal from the dismissal of plaintiffs' complaint, the facts on appeal are those alleged in the complaint.

### A. Complaint

#### 1. *Contingent Commissions*

There are generally three parties to a large commercial insurance contract: the company seeking to buy the insurance, the insurance

company selling the insurance, and the brokerage firm that procures the insurance. Aon's core business is as a brokerage firm. Aon is the world's second-largest insurance broker, trailing only Marsh & McClennan, Inc.

Typically, a party procuring insurance through a broker makes two payments: a premium that goes to the insurance carrier and a commission paid to the insurance broker. Plaintiffs allege that Aon has for many years collected additional payments known as "contingent commissions." These are payments made from insurance carriers to the brokers, based on volume and profitability of business passed on from the broker to a particular carrier. Plaintiffs allege that contingent commissions encouraged Aon to send business to carriers that offered the highest commission, not necessarily those most suitable to meet the needs of Aon's clients.

Aon's statements to shareholders and investors failed to disclose the true nature of the practices. On its Web site in 2004, Aon justified contingent commissions as follows: "Aon performs activities and provides services of value to its insurers, including providing access to its substantial networks." These contingent commissions were a significant source of revenue for Aon, amounting to hundreds of millions of dollars annually; for fiscal year 2003, Aon collected $169 million in contingent commissions, representing approximately 25% of its net income for that fiscal year.

Plaintiffs allege that Aon's contingent-commissions strategy was conceived and executed at the highest levels of the corporation and that, therefore, defendants were aware of and participated in these arrangements. Aon openly engaged in wide-ranging practices to maximize revenues from contingent commissions at Aon Risk Services, Personal Lines, Aon Re, and Aon Consulting. In 2003, Aon Risk Services, the brokerage and risk-management arm of Aon, was organized around a "Syndication Group" of executives. This group organized each product line into national units that oversaw placements and the negotiation of new contingent commission agreements. In a July 2001 e-mail to employees, Robert Duncan advised to "maximize business to markets where Aon gets the best arrangements." In July 2003, O'Halleran internally announced the formation of a Global Contingency Committee to "develop a strategy to maximize our contingencies throughout the entirety of Aon's relationship with markets." Steering business to favored insurers was an important part of Aon Risk Services' contingent-commission agreements, and the company provided financial incentives to employees who steered placements to high-paying insurers.

At Aon's Personal Lines division, Aon entered into "producer funding agreements" with insurers, which provided for insurers to fund the hiring of brokers, who would then steer business to the funding insurer. For example, Chubb and Fireman's Fund funded 50% of the salary and benefits for certain Aon brokers for the purpose of selling their respective insurance. At Aon Re Global, Aon's reinsurance business, Aon demanded that insurers use Aon Re's reinsurance services, and in exchange, Aon increased retail placements with the carrier. This practice was so routine that it was memorialized in "clawback agreements." Ryan negotiated one such agreement with Chubb. The Aon Consulting division, which provided clients with consulting on employee benefits and insurance, pledged to clients that it would make recommendations "regarding the most effective plan management" and "obtain the greatest level of benefits available." At the same time, Aon entered into national and local contingent-commission agreements, which motivated Aon to steer business to insurers that paid contingent commissions.

### 2. *Litigation Related to Contingent Commissions*

The complaint alleges that this conduct was challenged as early as 1999, when Aon's clients filed class actions against Aon in state courts in Illinois and California, "making allegations that Aon received improper kickbacks from insurance companies, in breach of Aon's fiduciary duty to clients and in violation of state statutes." *Daniel v. Aon*, No. 99 CH 11893, was filed in Illinois state court and alleged breach of fiduciary duty and violations of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/1 *et seq.* (West 1998)) and the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1998)). Dispositive motions were denied, and a class was certified on July 28, 2004. A $38 million settlement with Aon was later approved in 2006. The other case, which made similar allegations, was filed in California by Scott Turner.

Other lawsuits were filed against the insurance companies themselves in 2000. These lawsuits generated "substantial publicity," including stories in the Chicago Tribune. Plaintiffs also cite a February 14, 1999, New York Times article that described the contingent commission structure. It stated that the payments had become a "hot topic" in the commercial insurance business. It named Marsh and Aon as the two "giant brokers" that "dominate the field." A March 1999 article in the Financial Times reported similarly.

In April 2004, New York Attorney General Eliot Spitzer subpoenaed multiple insurance brokers, including Aon, as part of an investigation into the industry. In October 2004, Spitzer brought an

action against Marsh & McClellan for deceptive practices, and the next day it was revealed that Spitzer was also investigating Aon. One week later, Aon announced that it would stop accepting contingent commissions. In January 2005, Marsh settled with Attorney General Spitzer.

On October 28, 2004, defendants issued a press release announcing financial results and disclosing that in 2004, Aon had collected $117 million in contingent commissions. Under the guise of "recent industry developments," defendants indicated that they were "in the process of terminating contingent commission arrangements" and would be implementing "a new business model" that ensured "full transparency and the trust of our clients."

The Chicago Tribune reported in a December 5, 2004, article that Ryan stated he was "very comfortable with our past behavior" and that no steering had ever occurred at Aon. The next day, Aon issued a press release asserting that the characterizations of Ryan as being "not fazed" were inaccurate. It further provided that Aon took the matter "very seriously" and that the majority of its employees adhered to the code of conduct; however, "we have found indications that some employees have not always followed these principles."

On March 3, 2005, Attorney General Spitzer brought suit against Aon asserting claims for fraudulent business practices, unjust enrichment, common-law fraud, and securities violations. According to Spitzer's press release, the complaint alleged that the contingent commissions were rewards for the business that Aon steered and allocated to the insurance companies. The complaint "cites internal communications in which top executives openly discussed these efforts to maximize Aon's revenues and insurance companies' revenues." Illinois Attorney General Lisa Madigan filed a similar suit in Illinois on March 4, 2005.

Aon entered into a settlement agreement with Spitzer and Madigan on March 4, 2005. The settlement required Aon to pay $190 million to a fund for eligible policyholders and implement a comprehensive business reform scheme. Attached as an exhibit to the settlement agreement was a statement by defendant Ryan providing as follows:

> "Aon *** entered into contingent commission agreements and other arrangements that created conflicts of interest. I deeply regret that we took advantage of those conflicts. This conduct violated the longstanding principle embodied in our Code of Conduct and Aon's Values Statement that our clients must always come first. Such conduct was improper and I apologize for it. *** Aon looks forward to working with regulators, insureds, and other stakeholders to put in place new business practices for the entire

industry that eliminate the improper practices exposed by these investigations."

In the wake of the contingent-commissions controversy, federal actions were also filed in 2004 against certain board members in connection with the decline in the company's share price. The federal court upheld claims for securities fraud against defendants Aon, Ryan, and O'Halleran (*Roth v. Aon Corp.*, No. 04 C 6835 (N.D. Ill. March 2, 2006)) and for violations under the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. §1001 *et seq.* (1994)) against Aon and each of the directors named in the case at bar (*Smith v. Aon Corp.*, No. 04 C 6875 (N.D. Ill. April 12, 2006)). The judge also certified classes in both cases.

In October 2004 and February 2005, two parallel class action lawsuits were filed in federal courts against Aon. The first, brought by commercial-brokerage clients, alleged that Aon and other brokers and insurance companies manipulated the market for insurance through undisclosed profit-sharing agreements and kickbacks. It asserted claims for violation of the Racketeer Influenced and Corrupt Organization Act (RICO), the Sherman Act, and the antitrust laws of all 50 states; breach of fiduciary duty; aiding and abetting breach of fiduciary duty; conspiracy; and unjust enrichment. In the second case, employees who purchased insurance through employee-benefit plans and employers who purchased insurance for such plans alleged the same claims against Aon and others.

### 3. *Demand Futility*

Plaintiffs alleged that the required demand on the board of directors is excused for futility[1] because (1) the board's actions were beyond the scope of the business judgment rule, (2) the board is "interested" because it faced a substantial likelihood of liability for breaching its fiduciary duties to Aon and executing an illegal business plan pursuant to which it exposed Aon to litigation, and (3) the board ignored "red flags" regarding the propriety of contingent commissions, including the lawsuits that were filed as early as 1999. Alternatively, the board failed in its oversight duties to detect, prevent, and halt the violations of law that were occurring at Aon.

In addition, plaintiffs alleged that the board was not independent, so none of the defendants would ever vote to sue Ryan, Aon's "most powerful figure." According to a December 5, 2004, article in the Chicago Tribune, Ryan is "friend to Mayor Daley, co-owner of the Chicago Bears, dinner host to President Bush and namesake of Northwestern University's football field." The director defendants

---

[1]"Demand futility" is a term of art used in shareholder derivative actions.

have extensive personal and business relationships that compromise their independence. For example, several board members served together at other corporations, and several have served together in civic organizations and universities.

A leading corporate governance firm, the Corporate Library, gave Aon's board of directors a "D." It also gave the board a grade of "F" in its analysis of board compensation. During one or more of the fiscal years 2003 and 2004, defendants Rogers, Morrison, Notebaert, and Woo served on the board's audit committee, which oversaw the financial reporting process. During one or more of the fiscal years 2001 through 2004, defendants Notebaert, Knight, Losh, McKenna, and Mossion served on the compensation committee.

### 4. *Dismissal of the Complaint*

Plaintiffs initially filed their complaint on February 22, 2005. This complaint was amended after Attorney General Spitzer's action was brought, and on October 31, 2005, the first amended complaint was dismissed. However, plaintiffs were permitted to conduct discovery into Aon's actions with respect to contingent commissions. The third amended complaint was filed on January 17, 2007.

On September 21, 2007, the trial court found that plaintiffs had failed to demonstrate that demand was futile and that plaintiffs had failed to state a claim and, as a result, dismissed the complaint with prejudice.

### B. Discovery

On September 13, 2005, the trial court ordered Aon to produce certain documents for plaintiffs to use in amending their complaint. Aon produced the documents on October 20, 2005, along with a privilege log identifying nine documents to which privileges were asserted. In this first privilege log, Aon asserted both the work-product and attorney-client privileges to two of the documents and only the attorney-client privilege to the other seven. Plaintiffs filed a motion to enforce the first discovery order on January 10, 2006; as part of this motion, plaintiffs requested that Aon be ordered to identify the authors of the documents and the capacities of those listed as recipients of the documents.

On March 21, 2006, the trial court ordered Aon to revise its privilege log to include the information requested by plaintiffs. Subsequently, Aon produced its first amended privilege log, which indicated that four of the nine documents had been shared with third parties, namely, Aon's outside auditor, accounting firm Ernst & Young, and its investment banker, Lazard Freres, Inc. This log also asserted the work-product privilege as to all nine listed documents.

On June 5, 2006, Aon produced a second revised privilege log, which continued to assert the work-product privilege as to all nine documents but withdrew the attorney-client privilege as to the four documents that were shared with third parties.

Plaintiffs then filed a second motion to enforce the discovery order arguing that no privileges applied to any of the nine documents because (1) the subject matter of the documents had been shared with Aon's outside auditor and investment banker and (2) it was improper to assert a new privilege in an amended privilege log. On August 30, 2006, the trial court ordered that all nine documents be provided for *in camera* review, and on October 23, 2006, it denied plaintiffs' motion.

This appeal followed.

## II. ANALYSIS

### A. Motion to Dismiss

This court reviews dismissal under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 2006)) *de novo. Shaper v. Bryan*, 371 Ill. App. 3d 1079, 1086 (2007). "A section 2—615 motion attacks the legal sufficiency of a complaint, and this court's inquiry is limited to whether the allegations of the complaint, when viewed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted." *Kopka v. Kamensky & Rubenstein*, 354 Ill. App. 3d 930, 933 (2004). "This court must accept as true all well-pled factual allegations contained in the complaint and construe all reasonable inferences therefrom in favor of plaintiff. [Citation.] However, a plaintiff cannot rely simply on conclusions of law or fact unsupported by specific factual allegations." *Kopka*, 354 Ill. App. 3d at 933-34.

### 1. *Delaware Law*

Plaintiffs first argue that the trial court erred in granting the motion to dismiss because their complaint sufficiently alleged the required demand on the board of directors was excused. The issue of demand futility will be determined according to the substantive law of Delaware, the state where Aon was incorporated. *Spillyards v. Abboud*, 278 Ill. App. 3d 663, 667 (1996).

Delaware law requires that before bringing a derivative action on behalf of the corporation, the shareholder must first make a demand on the board of directors that the corporation itself bring such action. Del. Ch. Ct. R. 23.1. To that end, plaintiffs must plead with particularity their efforts to secure the desired action from the board or the reasons that they either failed to secure such action or to

make such demand. Del. Ch. Ct. R. 23.1. " 'The directors of a corporation and not its shareholders manage the business and affairs of the corporation *** and accordingly, the directors are responsible for deciding whether to engage in derivative litigation.' " *White v. Panic*, 783 A.2d 543, 550 n.18 (Del. 2001), quoting *Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991).

The issues raised on appeal involve the application of the business judgment rule, which "serves to protect and promote the role of the board as the ultimate manager of the corporation." *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 746 (Del. Ch. 2005). Because courts are ill-equipped to engage in post hoc substantive review of business decisions, the business judgment rule " 'operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation.' " *In re Walt Disney Co.*, 907 A.2d at 746, quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993).

■ The business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). This presumption applies when there is no evidence of fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment on the part of the directors. *In re Walt Disney Co.*, 907 A.2d at 747. In the absence of this evidence, the board's decision will be upheld unless it cannot be attributed to any business purpose. *In re Walt Disney Co.*, 907 A.2d at 747. "When a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste." *In re Walt Disney Co.*, 907 A.2d at 747.

The presumption can be rebutted by showing that the board violated "any one of its triad of fiduciary duties: due care, loyalty, or good faith." *Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001). If the presumption is rebutted, the burden shifts to the director defendants to demonstrate that the transaction was "entirely fair" to the shareholder plaintiffs. *Emerald Partners*, 787 A.2d at 91.

### 2. Demand Futility

■ The demand required under Delaware Chancery Rule 23.1 may be excused in cases in which such a demand would be futile. Demand futility must be alleged against the board as it was composed on the date on which plaintiffs filed their third amended complaint, January 17, 2007. *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006). Specific facts must be alleged against each director. *Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007).

■ The *Aronson* court announced a disjunctive test to be used in determining demand futility: "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. To impugn the disinterestedness or independence of the board, as required under the first prong of *Aronson*, plaintiffs must allege particularized facts establishing that a majority of the board lacks such independence. *Brehm v. Eisner*, 746 A.2d 244, 257 (Del. 2000).

The *Aronson* test of demand futility applies only in cases in which an action of the board of directors is challenged. *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993). When the subject of a derivative suit is the absence of board action rather than affirmative acts of the board, the appropriate inquiry is "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. "The *Rales* test essentially eliminates the business judgment rule prong of the *Aronson* test and focuses solely on whether the pleadings create a reasonable doubt that a majority of directors are disinterested and independent." *In re Morgan Stanley Derivative Litigation*, 542 F. Supp. 2d 317, 322 (S.D.N.Y. 2008).

Plaintiffs, invoking all three tests of demand futility, contend that demand is excused because the board (1) is interested and lacks independence, (2) approved an illegal business plan, and (3) failed to act in the face of repeated "red flags" indicating problems.

### a. First prong of *Aronson*

■ Plaintiffs first allege that the directors are "interested" under the first prong of *Aronson* because they face personal liability in the pending federal securities and ERISA litigation, based on similar facts, and both of these cases have withstood motion practice and classes have been certified. A director is interested when he receives a personal financial benefit that is not equally shared by the stockholders. *Rales*, 634 A.2d at 936. Directorial interest also exists when a corporate decision will have a materially detrimental impact on a director but not the corporation or its stockholders. *Rales*, 634 A.2d at 936. However, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors"; there must instead be a "substantial likelihood" of personal liability for a major-

ity of the board. *Aronson*, 473 A.2d at 815. Whether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness of a majority of the board must be taken from the accumulation of all the facts taken together. *In re Veeco Instruments, Inc. Securities Litigation*, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006).

Plaintiffs rely on two federal cases, applying Delaware law, in support of their argument. First, in *In re Veeco Instruments, Inc. Securities Litigation*, the court concluded that one of the defendants was not a disinterested director and, therefore, would not have been capable of impartially and objectively considering a demand on the board. *In re Veeco Instruments, Inc. Securities Litigation*, 434 F. Supp. 2d at 275. In addition to serving on the board of directors, the defendant had worked for the company for 40 years, so it was a substantial—if not the sole—source of his income. *In re Veeco Instruments, Inc. Securities Litigation*, 434 F. Supp. 2d at 275. Furthermore, a pending class action complaint for securities fraud against him and other directors "render[ed] his ability to impartially consider a demand even more doubtful," as the complaint had survived a motion to dismiss. *In re Veeco Instruments, Inc. Securities Litigation*, 434 F. Supp. 2d at 275.

In *In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. 117 (D.N.J. 1999), the court found that the plaintiff created a reasonable doubt as to the disinterestedness of the directors. "Each of the sixteen Director Defendants is interested because he is a defendant in other pending class action suits arising out of the accounting irregularities and faces significant personal liability for the wrongdoing alleged in the complaint." *In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. at 129. In addition, the defendants benefitted from the merger, and they sold 4 million shares of stock while in the possession of materially adverse, insider information. *In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. at 129. They also approved false statements contained in a number of documents and received personal benefits through those false statements. *In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. at 129. Accordingly, demand futility was adequately pled. *In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. at 129.

We find *Veeco* and *Cendant* to be distinguishable because pending parallel litigation was not the main ground on which disinterestedness was found in those cases. The court in *Cendant* found a lack of disinterestedness because of a substantial likelihood of liability resulting from the allegations pled in the derivative complaint, including insider trading, knowing or reckless disregard of accounting irregularities, and making false public filings. *In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. at 129. In *Veeco*, the court concluded that

a director lacked disinterestedness due to his status as the chief executive officer of the company, and only after reaching this conclusion did it add that the other pending lawsuit "renders his ability to impartially consider a demand *even more doubtful.*" (Emphasis added.) *In re Veeco Instruments, Inc. Securities Litigation*, 434 F. Supp. 2d at 275.

Furthermore, the only individuals named as defendants in both the federal securities case, *Roth v. Aon Corp.*, and this case are Ryan and O'Halleran, so it cannot impugn the disinterestedness of Aon's 14-member board. We further note the difference in the pleading standards for stating an ERISA claim in federal court under its notice pleading rules and alleging demand futility under Delaware's strict rules requiring "particularized facts."

Plaintiffs next argue that demand is excused because the Aon board lacks independence, an inquiry required by both the first prong of *Aronson* and the *Rales* test. A reasonable doubt as to the independence of a director may be raised "because of financial ties, familial affinity, a particularly close or intimate personal or business affinity or because of evidence that in the past the relationship caused the director to act non-independently vis à vis an interested director." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004). However, "[m]ere allegations that [directors] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes." *Beam*, 845 A.2d at 1051-52. Plaintiffs argue that the Aon board lacks independence because defendant Ryan dominates the board "by virtue of his position, public profile, and huge Aon shareholding," the directors are friends and serve together on other boards, and corporate watchdogs have criticized the composition of the Aon board.

Plaintiffs argue that the facts here are similar to those in *In re New Valley Corp. Derivative Litigation*, No. Civ. A. 17649 (Del. Ch. January 11, 2001). However, board members in that case were found to be employed by companies on both sides of the transactions at issue, which has not been alleged here. The complaint does allege that some directors were officers or board members at corporations with financial ties to Aon, but fails to allege with particularity that such arrangements were or could have been leveraged in order to negate the independence of such board members. These are merely allegations that board members moved in the same business and social circles, which is insufficient to excuse demand. Other cases cited by plaintiffs on this point are unavailing as they deal with factual situations of far greater severity than has been alleged here. See *In re Oracle Corp. Derivative Litigation*, 824 A.2d 917 (Del. Ch. 2003); *In re Trump Hotels*

*Shareholder Derivative Litigation*, Nos. 96 Civ. 7820 DAB, 96 Civ. 8527 DAB (S.D.N.Y. September 21, 2000).

Plaintiffs' argument that the board lacks independence because it is dominated by defendant Ryan is unsupported by particularized factual allegations. For instance, plaintiffs argue that Ryan's "huge Aon shareholding" renders him a dominant figure, yet the complaint alleges only that Ryan controls approximately 8% of Aon's stock. In *Beam*, allegations that Martha "Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence." *Beam*, 845 A.2d at 1051. The facts alleged in *Beam* are similar in nature to those alleged here but of a vastly higher degree, and yet the Delaware Supreme Court found that demand was not excused. The allegations that Ryan continued to receive stock and that newspapers and corporate watchdogs disapproved of the Aon board's actions do not rise to the level of particularized facts showing that Ryan controlled the board.

Therefore, we conclude that plaintiffs failed to sufficiently allege demand futility under the first prong of *Aronson*.

### b. Second prong of *Aronson*

■ Plaintiffs next argue that demand is excused under the second prong of *Aronson*, under which demand is excused if a transaction is "so egregious on its face that board approval cannot meet the test of business judgment" (*Aronson*, 473 A.2d at 815), because the directors approved unlawful practices. Plaintiffs point to allegations that the commissions made up a material portion of Aon's annual net income and that contingent commissions were also a subject of Aon's annual audit, of which the board was advised. Furthermore, after his investigation, Spitzer described contingent commissions as part of Aon's business model, and Ryan stated that Aon would need to develop a "new business model" when he apologized on behalf of the company.

Plaintiffs contend that "at the demand futility stage, knowledge of information regarding a corporation's important products or services is imputed to officers and directors in derivative litigation." They cite *In re Abbott Laboratories Shareholders Derivative Litigation*, 325 F.3d 795 (7th Cir. 2003), and *In re Biopure Corp. Derivative Litigation*, 424 F. Supp. 2d 305 (D. Mass. 2006). In *Abbott*, the court inferred that the board was aware of the company's regulatory problems based on allegations regarding inspections by and letters from the federal government over a six-year period. In *Biopure*, the court imputed knowledge

of a Food and Drug Administration (FDA) clinical hold to the company's officers and directors. However, we agree with defendants that, by relying on *Abbott* and *Biopure*, plaintiffs conflate mere knowledge of the existence of contingent commissions with affirmative action by the board regarding those commissions in the face of alleged knowledge that contingent commissions were unlawful. See *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959, 968 (Del. Ch. 1996) ("Legally, the board itself will be required only to authorize the most significant corporate acts or transactions: mergers, changes in capital structure, fundamental changes in business, appointment and compensation of the CEO, etc.").

Indeed, the complaint fails to show that a majority of the directors took any action regarding the "illegal business plan" or that the alleged practices were known or even suspected to be illegal or improper. While defendant Ryan made a public apology after the Spitzer/Madigan settlement, it does not follow from this statement that the majority of the Aon board knew that contingent commissions were illegal, since it was issued by defendant Ryan and does not indicate that contingent commissions were unlawful, but merely "improper." Similarly, while the complaint alleges that steering to maximize revenue occurred and that "the inference is powerful that the entire board knew" that Ryan and O'Halleran were integral in managing these practices, the complaint lacks particularized allegations demonstrating such knowledge of or participation by a majority of the board.

Plaintiffs further argue that demand is excused under the second prong of *Aronson* because (1) Aon's directors continued their allegedly unlawful practices while "on notice" that these practices were unlawful and (2) their "conscious inaction" in continuing to accept contingent commissions placed their decision outside of the business judgment rule. Plaintiffs again rely on *In re Abbott Laboratories Derivative Litigation* to support this contention. In *Abbott*, the plaintiff specifically alleged that the board had knowledge of illegal conduct because, for instance, the board had received multiple warning letters from the FDA detailing regulatory violations over a period of several years. Furthermore, Abbott acknowledged in a Security Exchange Commission (SEC) filing that it had failed to comply with manufacturing regulations, the FDA met with Abbott representatives concerning Abbott's violations, and Abbott admitted to knowing about these problems in a press release. Finally, there was newspaper coverage of Abbott's ongoing regulatory issues. The Seventh Circuit held that demand was excused on this basis.

Plaintiffs here argue that because of two class action suits brought against Aon dating back to 1999 (the *Daniel* and *Turner* cases) and

the attendant news coverage brought by those suits, the Aon board was similarly on notice that Aon was engaged in illegal practices. Plaintiffs also allege that similar cases were filed in 2000. However, these claims clearly do not rise to the level of the pleadings in *Abbott*. In *Abbott*, the plaintiffs alleged that the federal government provided notice to the defendants that their practices were unlawful, and the defendants themselves admitted to wrongdoing. Here, all that is present is a spate of private litigation. The *Daniel* class was not certified until July 2004, shortly before Aon stopped accepting contingent commissions, and the matter settled in 2006, by which time the challenged practices had been ceased altogether. Further, although the class actions were filed in 1999 and publicity surrounded those cases, it was not until April 2004 that regulators showed any interest in contingent commissions.

At the time the third amended complaint was filed, defendants had to know that contingent commissions were considered improper. In 2005, Spitzer and Madigan brought suit against, and settled with, Aon. Cases were filed in federal court against Aon, Ryan, and O'Halleran in 2004. In October 2004 and February 2005, class action suits were filed against Aon. However, by 2007, when plaintiffs filed the third amended complaint, Aon had long stopped collecting contingent commissions.

The complaint does not allege particularized facts indicating that the board of directors affirmatively implemented a business plan so egregious that it could not meet the test of business judgment, as required by the second prong of *Aronson*. Therefore, demand is not excused under the second prong of *Aronson*.

### c. *Rales*

■ Plaintiffs next argue that demand is excused under *Rales* because defendants failed to act and properly supervise Aon in the face of repeated "red flags" indicating problems. *Caremark* held that "where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation *** a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." *Caremark*, 698 A.2d at 971. The court noted that this is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Caremark*, 698 A.2d at 967. Under *Caremark*, "the necessary conditions predicate for director oversight liability [are]: (a) the directors utterly failed to implement any reporting or information

system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." (Emphasis in original.) *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

Plaintiffs, again relying on the *Daniel* and *Turner* cases and related publicity, analogize to *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001), in which the plaintiffs pled sufficient "red flags" to excuse demand under *Caremark*. See also *In re SFBC International, Inc. Securities & Derivative Litigation*, 495 F. Supp. 2d 477 (D.N.J. 2007); *In re FirstEnergy Shareholder Derivative Litigation*, 320 F. Supp. 2d 621 (N.D. Ohio 2004); *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111 (S.D.N.Y. 2000). One of the "red flags" in *McCall* included a *qui tam* action, which plaintiffs here argue is similar to the class actions brought against Aon. However, there were further red flags in *McCall*, notably, the execution of 35 search warrants on offices around the country as part of a federal investigation. As discussed above, the *Daniel* and *Turner* class actions are insufficient to establish that the Aon board knew Aon was engaged in unlawful practices.

Furthermore, the complaint alleges that Aon did establish reporting systems. It alleged that several members of the board were part of the audit committee, that Aon was annually audited by an outside group, and that the Aon board met regularly. These allegations are not consistent with the idea that the directors have "utterly failed" to implement reporting systems. In addition, the complaint does not allege with particularized facts that the board "consciously failed to monitor or oversee" the operation of these reporting systems. Plaintiffs offer only conclusory statements that the board failed to establish necessary reporting mechanisms and citations to federal cases where far more substantial "red flags" were alleged with much more particularity than is present in the complaint. These allegations are insufficient to excuse demand under *Caremark*.

*4. Adequacy of Individual Counts in Plaintiffs' Complaint*

Plaintiffs allege that defendants "in bad faith" breached their fiduciary duties of loyalty, care, and disclosure by intentionally or recklessly approving a business plan that included solicitation and receipt of unlawful payments from insurance carriers. They allege in the alternative that defendants breached their fiduciary duties "by their deliberate and knowing indifference to Aon's illegal business scheme."

■ Defendants argue that the exculpatory clause contained in Aon's charter, as allowed by section 102(b)(7) of title 8 (Del. Code

Ann. tit. 8, §102(b)(7) (2001)), precludes plaintiffs' claims for breach of fiduciary duty and other counts predicated on breach of fiduciary duty, namely, gross negligence, waste of corporate assets, abuse of control, and gross mismanagement.[2] Section 102(b)(7) allows a corporation to include in its charter a provision:

"eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of [the] law; (iii) under §174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit." Del. Code Ann. tit. 8, §102(b)(7) (2001).

The statutory enactment of section 102(b)(7) was a "logical corollary to the common law principles of the business judgment rule." *Emerald Partners*, 787 A.2d at 91. The purpose of section 102(b)(7) is to permit stockholders to adopt a provision in the certificate of incorporation to free directors of personal liability in damages "for due care violations, but not duty of loyalty violations, bad faith claims and certain other conduct." *Malpiede*, 780 A.2d at 1095. Thus, a section 102(b)(7) charter provision bars a claim that is found to only state a due care violation. *Malpiede*, 780 A.2d at 1095. Plaintiffs contend that the exculpatory clause does not apply because the complaint alleged defendants' bad faith with particularity.

In *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27, 67 (Del. 2006), the Delaware Supreme Court stated that a failure to act in good faith may be shown where the fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation, *** acts with the intent to violate applicable positive law, or *** intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." Plaintiffs' allegations of bad faith rest on their allegation that defendants breached their fiduciary duties by approving a business plan that included solicitation and receipt of unlawful payments from insurance carriers and "by their deliberate and knowing indifference" to that scheme. For example, Ryan's public apology in connection with the Spitzer/Madigan settlement recognized that the company's conduct was "improper" and announced a new business plan.

---

[2]This provision can be applied at the pleadings stage, since plaintiffs do not challenge the "existence, terms, validity or authenticity" of the charter provision. *Malpiede v. Townson*, 780 A.2d 1075, 1079 (Del. 2001).

However, while defendants may have known that Aon was collecting contingent commissions, the complaint does not allege with specificity that they knew them to be illegal at the time or that they acted in intentional violation of the law. See *Walt Disney Co. Derivative Litigation*, 906 A.2d at 67. In *In re AXIS Capital Holdings Ltd., Securities Litigation*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006), the plaintiffs brought a securities fraud claim against an insurer based on its payment of contingent commissions to brokers. The plaintiffs claimed that the fact that the insurer announced it would cease the agreements following an investigation by the state Attorney General supported the conclusion that the defendants knew that the contingent commissions were illegal. The court disagreed, noting that contingent commission agreements had long been in general use in the industry and that the insurer's SEC filings disclosed the existence of such agreements. *AXIS Capital Holdings*, 456 F. Supp. 2d at 592. "[S]urely this open use of incentive agreements in the insurance industry renders implausible any inference that AXIS or its managers knew that the agreements were illegal." *AXIS Capital Holdings*, 456 F. Supp. 2d at 592.

The filing of the *Daniel* and *Turner* complaints in 1999 was also insufficient to show that the board knew of the alleged illegality of contingent commissions such that its approval of contingent commission agreements after 1999 constituted intentional approval of acts it knew to be illegal. In *White*, the plaintiffs alleged that the defendant board members must have known about an employee's misconduct because they agreed to settle eight harassment suits brought against the employee and the company. The court held, however, that the plaintiff failed to allege that the challenged settlements were anything other than routine business decisions in the interest of the corporation. *White*, 783 A.2d at 553. While the directors were aware of the suits and the resulting settlements, "this fact does not indicate that the directors knew that the suits were meritorious." *White*, 783 A.2d at 553 n.31.

Plaintiffs again rely on *In re Abbott Laboratories Shareholders Derivative Litigation* to support their argument that defendants continued to collect contingent commissions while on notice that the practices were unlawful. As discussed above, however, the board in *Abbott* had knowledge of illegal conduct because it received multiple warning letters from the FDA detailing regulatory violations over a period of several years; Abbott acknowledged in an SEC filing that it had failed to comply with manufacturing regulations; the FDA met with Abbott representatives concerning Abbott's violations; Abbott admitted to knowing about these problems in a press release; and there was newspaper coverage of Abbott's ongoing regulatory issues.

As further discussed above, plaintiffs did not adequately plead that defendants failed to properly oversee Aon's operations. See *In re Caremark International Inc. Derivative Litigation*, 698 A.2d at 971; *Stone*, 911 A.2d at 370. *McCall*, 239 F.3d 808, is distinguishable. There were additional red flags in *McCall*, including the execution of 35 search warrants on offices around the country as part of a federal investigation.

The same analysis applies to plaintiffs' claim for abuse of control, gross negligence, and gross mismanagement. The claim for gross negligence alleges that the board's implementation of the business plan represented a systemic failure to assure adequate internal controls, and their claim for gross mismanagement alleged that defendants abandoned their responsibilities to manage the business. Gross negligence is defined as " 'reckless indifference to or deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.' [Citation.]" *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005). Such violations are "rarely found." *Benihana*, 891 A.2d at 192. For the reasons stated above, these counts fail to state a claim. Further, these counts were properly dismissed for the same reasons that the count for breach of fiduciary duty was dismissed pursuant to the exculpatory clause.

Plaintiffs offer only conclusory allegations that defendants' actions were in bad faith. Therefore, Aon's section 102(b)(7) exculpatory clause bars plaintiffs' claims premised on breach of fiduciary duty.

■ Plaintiffs next argue that they have sufficiently pled breach of contract. To establish a breach of contract, the plaintiff must show the existence of a valid and enforceable contract, performance of the contract by the plaintiff, breach of the contract by the defendant, and resulting injury to the plaintiff. *Werner v. Botti, Marinaccio & DeSalvo*, 205 Ill. App. 3d 673, 680 (1990). "The law is clear in Illinois that it is essential in pleading the existence of a valid contract for the pleader to allege facts sufficient to indicate the terms of the contract." *Kalkounos v. Four K's, Inc.*, 94 Ill. App. 3d 1011, 1012 (1981).

The complaint fails to "allege facts sufficient to indicate the terms of the contract." See *Kalkounos*, 94 Ill. App. 3d at 1012. The complaint alleges that defendants "contracted with Aon to act in the best interest of Aon and to cause Aon to operate lawfully and properly" in exchange for "substantial compensation and professional enhancement and prestige"; that each officer and director had an "express agreement" with Aon to serve in exchange for compensation; and that defendants breached their contractual obligations by not acting in the best interests of Aon and causing or permitting it to act in improper ways. The complaint makes allegations against defendants as a group

instead of alleging the specifics of the contract for each defendant. In addition, allegations as to the terms of the "express agreement" are lacking; plaintiffs' allegations as to defendants' breach of contract are "sketchy and conclusory." *Popp v. Cash Station, Inc.*, 244 Ill. App. 3d 87, 100 (1992).

Furthermore, to the extent that the alleged contract is written, plaintiffs failed to attach a copy of it to the complaint or an affidavit showing that it was inaccessible. Section 2—606 of the Code of Civil Procedure provides that if a claim "is founded upon a written instrument, a copy thereof *** must be attached to the pleading as an exhibit or recited therein, unless the pleader attache[d] to his or her pleading an affidavit stating facts showing that the instrument is not accessible to him or her." 735 ILCS 5/2—606 (West 2004). Plaintiffs, citing *Yardley v. Yardley*, 137 Ill. App. 3d 747, 752 (1985), claim that compliance with section 2—606 is excused because the contracts between Aon and defendants were not available to them. Nevertheless, plaintiffs failed to attach the affidavit required by section 2—606. Such failure is grounds for dismissal. *Popp*, 244 Ill. App. 3d at 100.

■ Plaintiffs next argue that they sufficiently pled waste of corporate assets. Under Delaware law, waste is defined as " 'an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.' As a practical matter, a stockholder plaintiff must generally show that the board 'irrationally squander[ed]' corporate assets—for example, where the challenged transaction served no corporate purpose or where the corporation received no consideration at all." *White*, 783 A.2d at 554, quoting *Louis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997). Under this standard, a corporate waste claim must fail if " 'there is any substantial consideration received by the corporation' " and there is a " 'good faith judgment that in the circumstances the transaction is worthwhile.' " (Emphasis omitted.) *White*, 783 A.2d at 554, quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000). A board's decisions do not constitute corporate waste unless they are "exceptionally one-sided." *White*, 783 A.2d at 554.

Plaintiffs allege that members of the compensation committee committed waste by paying defendants Ryan and O'Halleran incentive-based bonuses "based on unlawfully inflated financial results, which incentive based compensation was not earned and should never have been paid." The Delaware Supreme Court has held that "[a]lthough directors are given wide latitude in making business judgments, they are bound to act out of fidelity and honesty in their roles as fiduciaries." *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979). This count tends to conflate a waste claim with a duty of care claim;

plaintiffs themselves argue in support of their waste claim that they "allege facts that create a strong inference that the compensation committee defendants did not properly exercise their business judgment." Other courts have held that a waste claim not sufficiently alleging bad faith is barred by a section 102(b)(7) exculpatory clause. See *Continuing Creditors' Committee of Star Telecommunications, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 465 (D. Del. 2004), citing *Green v. Phillips*, C.A. No. 14436 (Del. Ch. June 19, 1996).

Even assuming, *arguendo*, that the clause cannot be applied to the waste claim, plaintiffs' allegations do not establish that "the challenged transaction served no corporate purpose" or that "the corporation received no consideration at all," as required by *White*, 783 A.2d at 554. To hold that this constitutes waste would be to assume that defendants Ryan and O'Halleran did nothing during their time at Aon except knowingly approve illegal business practices, which has not been pled sufficiently.

Plaintiffs' claim for waste stemming from money spent on professional fees and services in connection with defending legal action brought about by contingent commissions is also insufficient. This is a sort of indirect waste claim; plaintiffs argue that defendants' alleged approval of contingent commissions led to "unnecessary" litigation. This allegation does not comport with the requirements of a waste claim, as set forth in *White*. Such spending would only be waste if Aon received no consideration for its payments for these professional services, which plaintiffs have not alleged at all. Therefore, the claims for waste were properly dismissed.

•11 Plaintiffs next argue that they have sufficiently pled unjust enrichment. "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." *Jackson National Life Insurance Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999).

The complaint alleges that Ryan and O'Halleran were unjustly enriched by the "profits, benefits, and other compensation" they obtained from their wrongful conduct. However, the complaint does not allege, even in a conclusory fashion, the absence of justification and the absence of a remedy provided by law, two essential elements of a claim for unjust enrichment. Plaintiffs argue that there was an "absence of justification" for compensation paid to Ryan and O'Halleran, since they were paid substantial salaries and bonuses while Aon engaged in conduct that caused it to sustain more than $228 million in settlements. However, plaintiffs do not allege that Ryan and O'Halleran performed no work in exchange for their

compensation. Furthermore, there is no allegation that contingent commissions were paid directly to either Ryan and O'Halleran—that money went to Aon.

Therefore, we affirm the dismissal of plaintiffs' third amended complaint for the further reason that it fails to state a claim.

## B. Discovery

■ Finally, plaintiffs argue that the trial court erred in its application of attorney-client and work-product privileges in the discovery allowed during litigation. In particular, plaintiffs argue that the attorney-client privilege does not apply in a derivative case, that both types of privilege were waived, and that it was improper for Aon to "belatedly" assert work-product privilege as to a number of documents.

While discovery rulings are generally reviewed under an abuse-of-discretion standard, this court reviews a lower court's ruling concerning application of privileges in discovery *de novo*. *Sterling Finance Management, L.P. v. UBS PaineWebber, Inc.*, 336 Ill. App. 3d 442, 446 (2002). Because privileges protect rights outside of the discovery process and run counter to the general duty to disclose and the truth-seeking process, their application is strictly construed. *Sterling Finance Management*, 336 Ill. App. 3d at 446.

Plaintiffs argue that this court should follow the holding of *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970). In that case, the district court held that attorney-client privilege is not applicable against plaintiff shareholders suing a corporation derivatively. In affirming that decision, the Fifth Circuit held that "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." *Garner*, 430 F.2d at 1103. The court stated that "[t]here are many indicia that may contribute to a decision of presence or absence of good cause." *Garner*, F.2d at 1104. Plaintiffs assert that such indicia present here include (1) their assertion of a colorable claim against defendants, (2) the alleged illegality of the challenged actions, (3) that the communication sought is identified and not merely blind fishing on the part of the plaintiffs, and (4) that the documents are not available elsewhere. Plaintiffs also identify several jurisdictions, including Delaware courts, that have adopted *Garner* in this context.

However, even the courts that have adopted *Garner* have refused to apply it to claims of work product, which the trial court found as to

all nine documents. For example, *In re International Systems & Controls Corp. Securities Litigation*, 693 F.2d 1235, 1239 (5th Cir. 1982), held that *"Garner's* rationale indicates that it [is] not intended to apply to work product." *Garner* is premised on the "mutuality of interest" between shareholder and management, "[b]ut once there is sufficient anticipation of litigation to trigger the work product immunity, we think this mutuality is destroyed." *International Systems & Controls Corp.*, 693 F.2d at 1239. Therefore, the trial court did not err in refusing to apply *Garner*.

Plaintiffs next argue that defendants waived both privileges as to all nine documents. Plaintiffs contend that defendants, in their second amended privilege log, revealed that four of the challenged documents were disclosed to outsiders and that the attorney-client privilege was then withdrawn as to those documents by defendants. Plaintiffs argue that because the remaining five documents concern the same subject matter, the attorney-client privilege is also waived for those documents. In support of this argument plaintiffs cite *In re Grand Jury January 246*, 272 Ill. App. 3d 991, 997 (1995), where the court held that "where a client reveals portions of her conversation with her attorney, those revelations amount to a waiver of the attorney-client privilege as *to the remainder of the conversation or communication about the same subject matter."* Plaintiffs further argue that this waiver extends to a situation in which the revealed communication was protected by the work-product privilege. However, plaintiffs do not identify any authority that stands for the proposition that the disclosure of documents protected under the work-product privilege to third parties results in a subject-matter waiver.

Plaintiffs next assert that the work-product privilege was waived as to the four documents shared with outside auditors and financial advisors. The only Illinois case cited by plaintiffs in support of their argument is *Dalen v. Ozite Corp.*, 230 Ill. App. 3d 18 (1992), which concerned actual, though inadvertent, disclosure of work product to a party's litigation adversary. In finding that the work-product privilege had been waived, the court applied a balancing test described in *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.*, 132 F.R.D. 204, 209 (N.D. Ind. 1990): " '(1) the reasonableness of the precautions taken to prevent the disclosure; (2) the time taken to rectify the error; (3) the scope of [the] discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness.' [Citation.]" *Dalen*, 230 Ill. App. 3d at 28. This test does not apply to the case at bar, since there has been no disclosure of the challenged documents to plaintiffs, as there was in *Dalen*.

Plaintiffs argue, however, that for purposes of the determination of privilege, outside auditors should be treated as litigation adversaries. Plaintiffs rely on *Medinol, Ltd. v. Boston Scientific Corp.*, 214 F.R.D. 113 (S.D.N.Y. 2002). The *Medinol* court held that the auditor's review of minutes of board meetings and role in examining a company does not give the auditor interests common to those of the company being audited. The court held that Boston Scientific's disclosure of minutes to its auditor "did not therefore serve the privacy interests that the work product doctrine was intended to protect." *Medinol*, 214 F.R.D. at 117. However, the court noted that Boston Scientific's disclosure of minutes of the meetings of its special litigation committee to the auditor was not in the aid of litigation. It is not clear here as to whether the challenged documents at issue were disclosed to outside auditors in the aid of litigation. Absent such knowledge, the facts here are not necessarily similar to those in *Medinol*.

Defendants point to *FMC Corp. v. Liberty Mutual Insurance Co.*, 236 Ill. App. 3d 355 (1992). In that case, the court held that documents that were not likely to be disclosed to a third party but were transmitted only between the company and its accountant-auditor were not subject to disclosure. The court further recognized that "[o]ur legislature has determined that the accountant-client relationship is one of substantial significance and by enactment of section 27 [of the Illinois Public Accounting Act (Ill. Rev. Stat. 1987, ch. 111, par. 5533)] encourages people to make use of professional accounting services and to be frank and candid with such professionals. Accordingly, it is critical to our analysis that we do not carve out a series of exemptions that would emasculate the straightforward language of section 27." *FMC Corp.*, 236 Ill. App. 3d at 358-59. The statute discussed therein stated, in pertinent part, "A public accountant shall not be required by any court to divulge information or evidence which has been obtained by him in his confidential capacity as a public accountant." Ill. Rev. Stat. 1987, ch. 111, par. 5533. Defendants further cite numerous cases from other jurisdictions in which courts have declined to find a waiver of work product protection when documents are disclosed to independent auditors, generally because such disclosure "does not substantially increase the opportunity for potential adversaries to obtain the information." *United States v. Textron Inc.*, 507 F. Supp. 2d 138, 152-53 (D.R.I. 2007). See also *Lawrence E. Jaffe Pension Plan v. Household International, Inc.*, 237 F.R.D. 176, 183 (N.D. Ill. 2006). Illinois case law supports defendants, and the reasoning of the federal courts against a waiver of work product when documents are disclosed to auditors is persuasive. Therefore, the trial court correctly held that Aon's disclosure of privileged documents to

outside auditors does not constitute a waiver of the work product privilege.

Finally, plaintiffs argue that it was improper for Aon to assert work-product protection for several documents after failing to do so in its first privilege log and that, therefore, the privilege does not apply to the documents for which it was not originally asserted. Again, plaintiffs do not identify any Illinois case law to support their argument. Plaintiffs do cite two Illinois cases in support of the proposition that "failure to assert a privilege will result in waiver." However, both of these cases concern situations in which parties actually disclosed protected information to litigation adversaries without asserting that such information was privileged. See *Profit Management Development, Inc. v. Jacobson, Brandvik & Anderson, Ltd.*, 309 Ill. App. 3d 289, 300 (1999); *People v. Watson*, 76 Ill. App. 3d 931, 938 (1979). As such, these cases do not support plaintiffs' argument.

Similarly, the two federal cases cited by plaintiffs, *International Insurance Co. v. Certain Underwriters at Lloyd's London*, No. 88 C 9838 (N.D. Ill. October 26, 1992), and *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 230 F.R.D. 398 (D. Md. 2005), are cases in which the court found work product protection waived in large part because of concern that to hold otherwise would create high litigation costs and encourage judicial waste. In *International Insurance*, defendants asserted a new privilege after the court deemed the previously asserted privilege inapplicable. In *Neuberger*, the court was forced twice to review the challenged documents *in camera* and rejected the privilege claims as to many of the documents. *Neuberger*, 230 F.R.D. at 403. Here, the judge only once reviewed the documents and upheld the assertion of work product privilege with respect to all nine documents.

Additionally, defendants point to cases from other jurisdictions in which work product was not deemed waived when it was not asserted in the original privilege log. In *Scurto v. Commonwealth Edison Co.*, No. 97 C 7508 (N.D. Ill. January 11, 1999), the court found that, although the original privilege log only asserted work product privilege, the later amendment to include attorney-client privilege preserved such privilege. In *Strougo v. BEA Associates*, 199 F.R.D. 515 (S.D.N.Y. 2001), the court allowed a belated assertion of work product protection to a document for which only attorney-client privilege was originally asserted. That finding was based on the fact that the opposing party could not identify any harm caused by the delay. *Strougo*, 199 F.R.D. at 523. While the delay in updating the privilege log in this case is vastly longer than it was in *Strougo* (six months as opposed to two weeks), plaintiffs do not assert that they were harmed by this

delay, nor is it asserted that this delay caused inordinate expenditure of judicial time or resources.

## III. CONCLUSION

For the foregoing reasons, we affirm the dismissal of plaintiffs' complaint and the trial court's decisions regarding discovery.

Affirmed.

THEIS and COLEMAN, JJ., concur.