2022 IL App (1st) 210336

FIFTH DIVISION
Order filed: February 25, 2022

No. 1-21-0336

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| DONNA BIEFELDT and IBEW LOCAL 98 PENSION FUND, Derivatively on Behalf of The Allstate Corporation, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| (Donna Biefeldt, Appellant) | ) | |
| | ) | |
| v. | ) | Nos. 17 CH 10676 |
| | ) | 18 CH 04793 |
| THOMAS J. WILSON, MATTHEW E. WINTER, | ) | |
| JUDITH A. SPRIESER, ANDREA REDMOND, | ) | |
| KERMIT R. CRAWFORD, SIDDHARTH N. MEHTA, | ) | |
| MICHAEL L. ESKEW, MARY ALICE TAYLOR. JOHN | ) | |
| W. ROWE, F. DUANE ACKERMAN, JACK M. | ) | |
| GREENBERG, HERBERT L. HENKEL, ROBERT D. | ) | |
| BEYER, and THE ALLSTATE CORPORATION, | ) | Honorable |
| | ) | Anna M. Loftus, |
| Defendants-Appellees | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Connors concurred in the judgment and opinion.

**OPINION**

¶ 1    The plaintiff, Donna Biefeldt, an individual shareholder of the nominal defendant, the Allstate Corporation (Allstate), appeals from an order of the circuit court of Cook County that dismissed her second amended derivative complaint with prejudice. On appeal, she argues that the circuit court erred when it found that her second amended complaint failed to allege sufficient facts showing that a pre-suit demand on Allstate's board of directors would have been futile. For the reasons that follow, we affirm.

¶ 2    The following facts relevant to this appeal were adduced from the pleadings and exhibits of record.

¶ 3    Allstate is a Delaware corporation headquartered in Northbrook, Illinois, that provides, among other things, automobile insurance. As a Delaware corporation, Allstate's business and affairs are managed by a board of directors (the board), not its shareholders. The board consists of ten members. In 2013, Allstate publicly disclosed a campaign to grow its automobile insurance policies-in-force; that is, the number of active automobile insurance policies at a given time. Allstate succeeded in achieving that growth, experiencing an increase in policies-in-force in each of the following two years. However, on August 3, 2015, Allstate reported its 2015 second quarter earnings, which reflected that automobile claims frequency was elevated for a third consecutive quarter. In its two prior quarterly reports, Allstate attributed the increase in automobile claims frequency to external factors, such as inclement weather and increased driving caused by economic growth. In a conference call with analysts and shareholders following the release of Allstate's 2015 second quarter earnings report, Allstate's CEO, Thomas J. Wilson, acknowledged that the increase in automobile policies-in-force played a role in the increased frequency of claims. The next day, shares of Allstate fell over 10%. Thereafter, a federal lawsuit was filed in the Northern District of

Illinois against Allstate, Wilson, and Matthew E. Winter, Allstate's President, alleging violations of federal securities law (*Carpenters Pension Trust Fund for Northern California v. Allstate Corporation*, No. 1:16-cv-10510 (N.D. Ill. 2016)).

¶ 4 Biefeldt is a shareholder of Allstate who has held her shares continuously since January 2012. On August 3, 2017, she filed a derivative complaint on behalf of Allstate (case no. 17 CH 10676) in the circuit court of Cook County, naming Allstate as a nominal defendant and several of Allstate's officers and outside directors as individual defendants. The complaint named the following three Allstate officers as defendants: Wilson, Allstate's chief executive officer and chairman of the board; Winter, Allstate's president; and Steven E. Shebik, Allstate's vice president and chief financial officer. The complaint also named 11 current and former outside directors of Allstate as defendants: Kermit R. Crawford, Michael L. Eskew, Siddharth N. Mehta, Andrea Redmond, Judith A. Sprieser, F. Duane Ackerman, Robert D. Beyer, Jack M. Greenberg, Herbert N. Henkel, John W. Rowe, and Mary Alice Taylor. At the time Biefeldt filed her complaint, four of the outside directors named as defendants—Ackerman, Greenberg, Henkel, and Breyer—were no longer serving on the board.

¶ 5 Biefeldt's complaint asserted two claims: breach of fiduciary duty and unjust enrichment. Specifically, the complaint alleged that the individual defendants "caused Allstate" to make improper statements regarding the factors leading to the increase in automobile claims frequency, which hurt Allstate's reputation and resulted in a 10% market capitalization loss. According to the complaint, Allstate's management relaxed underwriting standards to grow the number of automobile policies-in-force, which they knew would also result in a higher incidence of claims and impact profitability. And yet, when Allstate experienced the expected increase in automobile

claims frequency beginning in October 2013, the individual defendants misled investors by publicly blaming the increase on "temporary external factors" when they knew that the increase was caused by the policy of changing the underwriting standards to grow the number of policies-in-force. The complaint sought monetary damages and disgorgement of any compensation paid to the individual defendants. The complaint acknowledged that Biefeldt had not made a demand on the board to bring this action, alleging that "such a demand would be a futile, wasteful, and useless act." Specifically, Biefeldt alleged that a pre-suit demand would have been futile because a majority of the board—Crawford, Eskew, Mehta, Redmond, Rowe, Sprieser, Taylor, and Wilson—faced a substantial likelihood of liability for "allowing improper statements in [Allstate's] press releases and SEC filings" regarding auto claims frequency and, therefore, could not independently evaluate such a demand.

¶ 6     On November 13, 2017, the defendants filed a combined motion to dismiss the complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2016)). In their combined motion, the defendants argued that Biefeldt's complaint should be dismissed for failure to satisfy Delaware's requirement that a shareholder make a demand on the board of directors before initiating any action on behalf of the company. The defendants acknowledged that a shareholder is excused from making a pre-suit demand if such a demand would be futile due to a majority of the board facing a substantial likelihood of liability for the alleged misconduct. However, according to the defendants, Allstate's charter contains a provision that exculpates directors from personal liability to the corporation "to the fullest extent permitted by Delaware law," which eliminated any reasonable risk of monetary liability for Allstate's outside

directors based on Biefeldt's allegations. Therefore, the defendants argued, Biefeldt's failure to make a pre-suit demand of the board is not excused and her complaint should be dismissed.

¶ 7     On April 12, 2018, IBEW Local 98 Pension Fund (IBEW) filed its own derivative complaint on behalf of Allstate, naming the same defendants (case no. 18 CH 04793). IBEW's complaint also asserted the same claims as Biefeldt's complaint and was based on the same underlying facts.

¶ 8     On June 29, 2018, the circuit court dismissed Biefeldt's complaint without prejudice. In its written order, the court first noted that the parties agreed that Delaware law applied in this case. Applying the relevant law, the court found that Biefeldt failed to allege sufficient facts showing that a pre-suit demand on the board would have been futile. Specifically, the court found that Biefeldt's complaint failed to allege facts that cast doubt on the independence of any of the outside directors named as individual defendants, such as that they were unjustly enriched by their alleged misconduct or that they faced a substantial risk of liability. Regarding the latter, the court noted that, under Allstate's certificate of incorporation, directors are exculpated from monetary liability for any claim other than a claim for breach of the duty of loyalty or for acts or omissions that are not in good faith, involve intentional misconduct, or are a knowing violation of the law. The court found that the complaint included no such allegations against a majority of the board as constituted when Biefeldt filed her complaint. It therefore concluded that Biefeldt was not excused from making a pre-suit demand.

¶ 9     On July 19, 2018, Biefeldt and IBEW filed an unopposed motion to consolidate case nos. 17 CH 10676 and 18 CH 04793, which the circuit court granted.

¶ 10 On August 10, 2018, Biefeldt and IBEW (the plaintiffs) filed an amended derivative complaint against the same defendants, asserting claims for breach of fiduciary duty, corporate waste, and unjust enrichment. The plaintiffs again acknowledged that they failed to make a pre-suit demand on the board, alleging that such a demand would be futile. The defendants filed a combined motion to dismiss pursuant to section 2-619.1 of the Code, once again arguing that the amended complaint failed to allege particularize facts showing that a majority of the board was incapable of independently evaluating a demand. On May 14, 2019, the circuit court dismissed the plaintiffs' amended derivative complaint on the grounds that the plaintiffs failed to allege sufficient facts showing that a pre-suit demand would be futile.

¶ 11 Following the dismissal of their amended complaint, the plaintiffs filed a motion to stay the case for 90 days while they pursued a demand to inspect Allstate's books and records. In lieu of a stay, the parties stipulated that Allstate would produce several documents to the plaintiffs, including minutes of board meetings from the relevant time period and materials circulated to members of the board in advance of those meetings. Allstate complied and produced the documents to the plaintiffs.

¶ 12 On September 17, 2019, the plaintiffs filed their second amended derivative complaint, asserting claims of breach of fiduciary duty, corporate waste, and unjust enrichment. The plaintiffs also attached 31 exhibits, which consisted of several documents produced by Allstate pursuant to the stipulation. According to the plaintiffs, these internal documents showed that the individual defendants knew of, or recklessly disregarded, non-public information regarding the true cause of Allstate's increase in automobile claims frequency and its adverse impact on profitability, and they nevertheless allowed Allstate to make contrary public statements to investors and analysts.

¶ 13    In the second amended complaint, the plaintiffs again acknowledged that they did not make a pre-suit demand on the board, alleging that such a demand would be futile because a majority of the board was incapable of independently evaluating it. The plaintiffs noted that, at the time they filed the second amended complaint, six members of the board were also serving at the time of the alleged wrongdoing: Wilson, Crawford, Eskew, Mehta, Redmond, and Sprieser. According to the second amended complaint, these six directors faced a substantial likelihood of liability as a result of their alleged misconduct because they breached their duties of loyalty by making or allowing others to make public statements that they knew to be false regarding the cause of Allstate's increase in automobile claims frequency, and therefore, they could not independently evaluate a pre-suit demand.

¶ 14    The defendants filed a combined motion to dismiss pursuant to section 2-619.1 of the Code, arguing again that the plaintiffs failed to allege particularized facts showing that pre-suit demand of the board would be futile. Specifically, the defendants argued that the plaintiffs failed to allege that the five outside directors—Crawford, Eskew, Mehta, Redmond, and Sprieser—knew of any relevant information that contradicted Allstate's public statements regarding the increase in claims frequency or that they had any involvement in making or approving any of the allegedly false public statements. The defendants asked the circuit court to dismiss the second amended complaint with prejudice.

¶ 15    On February 24, 2021, the circuit court entered an order dismissing the second amended complaint with prejudice. The court also stated that its order was "final" and "[resolved] this case in its entirety." The plaintiffs appealed. However, on September 20, 2021, IBEW filed a motion to

withdraw as a party to the instant appeal, which this court granted. Thus, Biefeldt is the sole appellant in this matter.

¶ 16     On appeal, Biefeldt argues that the circuit court erred when it dismissed the second amended complaint on the grounds that she failed to allege sufficient facts showing that a pre-suit demand of Allstate's board of directors would have been futile.

¶ 17     The defendants' motions to dismiss were brought pursuant to section 2-619.1 of the Code, which permits a party to move for dismissal under both sections 2-615 and 2-619 of the Code. 735 ILCS 5/2–619.1 (West 2016). A section 2-615 motion to dismiss attacks the legal sufficiency of a complaint. *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 29. A motion brought pursuant to section 2-619 admits the sufficiency of the complaint but asserts affirmative matter that avoids or defeats the claim. *Id.*

¶ 18     Here, the circuit court concluded that the second amended complaint failed to allege sufficient facts to show that a pre-suit demand on the board would be futile. In other words, the court dismissed the second amended complaint because it was legally insufficient, which is a dismissal pursuant to section 2-615 of the Code. See *In re Huron Consulting Group, Inc. Shareholder Derivative Litigation*, 2012 IL App (1st) 103519 ¶ 32 (finding that, where defendants challenged a complaint on the grounds that the plaintiff failed to adequately plead demand futility, they "should have sought dismissal under section 2-615 of the Code"). When reviewing a motion to dismiss pursuant to section 2-615 of the Code, we accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences therefrom in favor of the plaintiff. *Sherman v. Ryan*, 392 Ill. App. 3d 712, 722 (2009). However, we need not consider mere conclusions of law or facts unsupported by specific factual allegations. *Id.* at 722. Moreover, "[a]n

exhibit attached to a complaint becomes part of the pleading for every purpose, including the decision on a motion to dismiss. [Citations.] Where an exhibit contradicts the allegations in a complaint, the exhibit controls. [Citation.]" *Steenes v. MAC Property Management, LLC*, 2014 IL App (1st) 120719, ¶ 16 (citing *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 18). We review a dismissal under section 2-615 *de novo*. *Lutkauskas*, 2015 IL 117090, ¶ 29.

¶ 19     A shareholder derivative action is a vehicle by which an individual shareholder brings suit to enforce a corporate cause of action against officers, directors, and third parties. See *In re Huron*, 2012 IL App (1st) 103519, ¶ 16. "It was intended as a vehicle to allow shareholders to protect a corporation's interests from faithless directors and managers." (Internal quotation marks omitted.) *Id.* "However, given the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders, most jurisdictions require a pre-suit demand be made of the corporation's board of directors. (Internal quotation marks omitted.) *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795, 803 (7th Cir. 2003). Thus, before a shareholder can bring a derivative suit, she must first demonstrate either that she made a demand on the corporation to pursue the action and that the demand had been refused or that such a demand would be futile. See *In re Huron*, ¶ 16; see also *Seinfeld v. Bays*, 230 Ill. App. 3d 412, 420 (1992).

¶ 20     As this court has recently explained, "the demand requirement is not merely a matter of procedure." *In re Huron*, 2012 IL App (1st) 103519, ¶ 17 (citing *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 96-97 (1991)). "Rather, it is a substantive determination as to who has the power to control corporate litigation; in essence, it reallocates the governing powers within the corporation." *Id.* (citing *Kamen*, 500 U.S. at 101). "Because corporations are 'creatures of state

law' and state law is the 'font of corporate directors' powers,' the substantive law of the state of incorporation applies in determining whether the shareholder has adequately established that she has satisfied the demand requirement to proceed with the litigation on the corporation's behalf." *Id.* (quoting *Kamen*, 500 U.S. at 98-99).

¶ 21    As was the case in *In re Huron*, the parties here agree that, because Allstate is incorporated in Delaware, the demand requirement is governed by Delaware law, and more specifically, Delaware Chancery Rule 23.1 (Del. Ch. Ct. R. 23.1). Rule 23.1 provides that:

> "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Del. Ch. Ct. R. 23.1(a).

Thus, demand futility allegations must be stated "with particularity," elevating the pleading requirements under Rule 23.1 beyond that which is required to survive an ordinary challenge under section 2-615 or its equivalent. *Malpiede v. Townson*, 780 A. 2d 1075, 1083 (Del. 2001).

¶ 22    Under Delaware law, "[d]emand futility claims are analyzed under one of two legal standards." *In re Huron*, 2012 IL App (1st) 103519, ¶ 36. Here, the parties agree that the appropriate standard to employ is the test set forth in *Rales v. Blasband*, 634 A. 2d 927 (Del. 1993). The *Rales* test is used when no particular action of the board is challenged, that is, "where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties." *Wood v. Baum*, 953 A. 2d 136, 140 (Del. 2008). Under the *Rales* test, "demand is excused only where 'the particularized factual allegations create a reasonable doubt that, [at] the time the complaint was filed, the board of directors could have properly exercised its

independent and disinterested business judgment in responding to a demand.' " *In re Huron*, 2012 IL App (1st) 103519, ¶ 37 (quoting *Braddock v. Zimmerman*, 906 A. 2d 776, 785 (Del. 2006)). "[I]f the directors face a 'substantial likelihood' of personal liability, their ability to consider a demand impartially is compromised under *Rales*, excusing demand." *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003). Where, as here, the corporation's charter includes an exculpatory provision, a substantial likelihood of liability "may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." *Wood*, 953 A. 2d at 141. Moreover, "[s]pecific facts must be alleged against each director." *Sherman v. Ryan*, 392 Ill. App. 3d 712, 722 (2009). Lastly, because Allstate's board consists of ten members, Biefeldt must show that at least five of the members could not exercise independent and disinterested business judgment in responding to a demand because they face a substantial likelihood of personal liability. See *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1046, fn. 8 (Del. 2004).

¶ 23    In urging us to reverse the circuit court's dismissal of the second amended complaint, Biefeldt contends that she sufficiently pleaded that six members of the board as constituted when she filed the second amended complaint—Wilson, Crawford, Eskew, Mehta, Redmond, and Sprieser—faced a substantial likelihood of liability based on violations of their duty of loyalty, a non-exculpated claim. Broadly speaking, the second amended complaint's allegations concerning these six members of the board fall into two categories: the allegations against the five outside directors—Crawford, Eskew, Mehta, Redmond, and Sprieser (the outside directors)—and the allegations against Wilson. As mentioned, to plead demand futility in this case, Biefeldt was required to make particularized allegations that at least five members of the board as constituted

when she filed the second amended complaint faced a substantial likelihood of liability. Thus, we first review Biefeldt's claims against the five outside directors because whether the second amended complaint sufficiently plead particularized facts that each of them faced a substantial likelihood personal liability is dispositive.

¶ 24    Biefeldt's argument that the second amended complaint included particularized facts alleging that the outside directors faced a substantial likelihood of personal liability for violating their duty of loyalty relies on three claims: (1) the outside directors signed Allstate's 2014 Form 10-K (2014 10-K) containing a statement they knew was false; (2) four of the outside directors also served on Allstate's Audit Committee and "played an integral role in formulating Allstate's earnings-related disclosures," two of which contained statements they knew to be false; and (3) the outside directors, even if they did not know the disclosures were false at the time they were made, failed to correct Allstate's false statements after learning the truth. We address each of Biefeldt's arguments in turn.

¶ 25    Biefeldt's first contention concerns an allegedly false disclosure made in Allstate's 2014 10-K, which was filed on February 19, 2015, and signed by the outside directors. In the second amended complaint Biefeldt alleges that the outside directors signed the 2014 10-K knowing that it contained a false disclosure regarding the cause of the increased automobile claims frequency Allstate experienced in October and November 2014. Specifically, Biefeldt alleges that the 2014 10-K attributed the increase in automobile claims frequency for those two months to "improved unemployment rates leading to higher miles driven and areas that experienced higher precipitation," when the directors knew that the true cause of the increase was Allstate's strategy of lowering underwriting standards to grow the number of policies-in-force.

¶ 26   The defendants respond that, even if the 2014 10-K included a false statement, the mere fact that the outside directors signed it is not enough to show that any of them "had a direct role in preparing" either the 2014 10-K or the specific challenged statement. The defendants alternatively argue that, even if signing the 2014 10-K were sufficient to show that the outside directors were responsible for preparing the 2014 10-K, the exhibits attached to the second amended complaint which form the basis of the allegations do not support a claim that the outside directors knew the information in the 2014 10-K was false. Ultimately, we agree with the defendants that the second amended complaint failed to plead with particularity that any of the outside directors possessed information indicating the 2014 10-K contained a false statement.

¶ 27   "[S]hareholders are entitled to honest communication from directors, given with complete candor and in good faith." *In re infoUSA, Inc. Shareholders Litigation*, 953 A. 2d 963, 990 (Del. Ch. 2007). A shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors "*deliberately* misinform[ed] shareholders about the business of the corporation, either directly or by a public statement." *Malone v. Brincat*, 722 A. 2d 5, 14 (Del. 1998). Thus, to show a substantial likelihood of liability that would excuse demand, a plaintiff must plead particularized factual allegations that "support the inference that the disclosure violation was made in bad faith, knowingly or intentionally." *O'Reilly v. Transworld Healthcare, Inc.*, 745 A. 2d 902, 915 (Del. Ch. 1999). When the threat of director liability is based on a disclosure violation, "plaintiffs must plead facts that show *** what the directors knew and when." *In re Citigroup Inc. Shareholder Derivative Litigation*, 964 A. 2d 106, 133-34 (Del. Ch. 2009).

¶ 28   Here, Biefeldt alleges that the outside directors knew when they signed the 2014 10-K that the disclosure attributing the recent increase in automobile claim frequency to external factors was

false because of information they received from Allstate's management. Biefeldt's allegations in this regard are derived from the various documents produced by Allstate and which she attached to the second amended complaint as exhibits. These exhibits include copies of slide presentations made by members of Allstate's management to the board and the minutes for meetings that occurred prior to the directors signing the 2014 10-K.

¶ 29    We have reviewed each of these exhibits, and we cannot find a single example where the outside directors were told what specific factors, either internal or external, were responsible for the increase in claim frequency Allstate experienced in October and November 2014. In other words, the exhibits do not reflect that the outside directors were told information that contradicted the disclosure made in the 2014 10-K that the claim frequency increase in October and November 2014 was caused by external factors.

¶ 30    Moreover, the second amended complaint includes allegations that seemingly undermine Biefeldt's contentions on appeal. The second amended complaint acknowledges that on February 4, 2015, which is 15 days before Allstate filed the 2014 10-K signed by the outside directors, Allstate publicly disclosed the October and November 2014 increase in claim frequency via a press release. The second amended complaint quotes the press release as stating that the increase was caused by "the impact of precipitation in select markets and general economic trend," which are the same external factors that would be cited in the 2014 10-K. Additionally, the second amended complaint states that, on February 5, 2015, Wilson and Winter had a conference call with investors and analysts during which they were asked specifically about the October and November 2014 increase in automobile claim frequency. According to the second amended complaint, Wilson referred the question to Winter, saying that Winter had spent an "untold number of hours" looking

into the issue. Winter is then quoted as telling the investors and analysts that he "saw nothing to indicate" that increase in claim frequency was "a quality of business issue or that it's being driven by growth, which is a natural question that you would have." Winter then attributed the increase to "two factors [that] traditionally drive [property damage] frequency: miles driven and precipitation." Thus, the second amended complaint indicates that Allstate's management was publicly attributing the increase in claim frequency to external factors and expressly rejecting any internal cause, citing a "detailed analysis" Winter conducted on the issue. And, as previously mentioned, none of the exhibits reflect that Allstate's management privately told the outside directors anything to the contrary.

¶ 31    Biefeldt acknowledges that the exhibits attached to the second amended complaint do not reflect that the outside directors were expressly told that the claim frequency increase in October and November 2014 was caused by the strategy to grow policies-in-force. She nevertheless argues in her brief on appeal that "it is reasonable to *infer*" from the information contained in the exhibits that the outside directors knew that Allstate's new-business growth was the true cause of the claim-frequency increase.

¶ 32    As best we can tell, Biefeldt's argument for why it is reasonable to infer that the directors knew that the disclosure in the 2014 10-K attributing the claim-frequency increase Allstate experienced in October and November 2014 to external factors was false or misleading is based on the following. By mid-2014, Allstate's management had informed the outside directors that it intended to grow Allstate's automobile policies-in-force though "broadening the customer target," which Biefeldt contends is a reference to the fact that management relaxed Allstate's underwriting standards to obtain new, riskier business. According to Biefeldt, there is a "fundamental industry-

specific axiom" that "new business growth has relatively higher frequency." Furthermore, when the outside directors learned in a series of meetings on January 28-29, 2015, that Allstate experienced an increase in automobile claims frequency in the fourth quarter of 2014, management cited no cause for the increase. Thus, Biefeldt's argument is essentially that, because the outside directors were told that the growth in business was achieved by underwriting riskier business, which they knew is associated with certain risks, and they were never told that external factors were behind the increase in claim frequency, it is reasonable to infer that the outside directors knew that the disclosure in the 2014 10-K attributing the increase to participation and miles driven was false or misleading.

¶ 33    We find Biefeldt's argument flawed. To begin, Biefeldt's argument relies on the fact that none of the materials attached to the second amended complaint reflect that the directors were told the cause of the fourth quarter increase in automobile claim frequency. She essentially fills in that gap with a "fundamental industry-specific axiom" that she imputes to the outside directors. It should go without saying, but we are not required to accept this type of conclusory allegation. See *Sherman*, 392 Ill. App. 3d at 722. Moreover, Biefeldt's argument ignores that, in the weeks before the 2014 10-K was filed, Wilson and Winter had publicly announced that an internal study of the increase in claim frequency concluded that the increase was caused by miles driven and precipitation and not the strategy to grow automobile policies-in-force. *In re Citigroup*, 964 A.2d at 132 ("[D]irectors of Delaware corporations are fully protected in relying in good faith on the reports of officers and experts."). In addition, after reviewing the exhibits Biefeldt primarily relies upon, exhibits 5 and 12, we find that they do not offer much, if any, support for her contention that

we can reasonably infer that the outside directors knew the true cause of the claim-frequency increase was the strategy of growing policies-in-force.

¶ 34    Biefeldt first cites to exhibit 5, which is a presentation made by Allstate's Chief Risk Officer, Steven C. Verney on May 19, 2014, to Allstate's Risk and Return Committee (Mehta and Sprieser were present for this meeting). One slide from that presentation included the heading "maintaining auto margins as we work to accelerate growth" with the following bullet point underneath: "[e]fforts to broaden risk targets in Allstate and Esurance brands creates selection and pricing risks on new business." According to Biefeldt, this portion of exhibit 5 is an acknowledgement from Allstate's management that their efforts to grow policies-in-force were achieved by lowering underwriting standards. Even if Biefeldt is correct in her reading of exhibit 5, such a reading only supports the inference that Mehta and Sprieser knew in May 2014 that there were potential risks associated with growing policies-in-force. However, there is nothing in exhibit 5 to connect the "selection and pricing risks" associated with the growth strategy to the specific increase in claim frequency Allstate experienced months later in October and November 2014, which is the specific false claim that she alleges that the outside directors made.

¶ 35    The other exhibit Biefeldt cites, exhibit 12, is a slide presentation Verney made on January 29, 2015, to a joint meeting of the board and Allstate's Audit Committee (all five outside directors were present). The presentation is titled "Enterprise Risk-Return Perspective on Operating Plan and SMART Goals." The relevant slide from that presentation is titled "Underlying Risks of Achieving Financial Plan." Beneath the title, the slide states: "Underlying risks to achievement of our financial plan are mitigated somewhat with growth and profitability momentum, as well as our ongoing monitoring and businesses processes." Below that text is a chart with four columns:

current environment, favorable factors ("tailwinds"), unfavorable factors ("headwinds"), and reflection in plan targets ("plan bets"). In the only non-redacted row visible on the slide, "profitability" is listed under the current trend heading. In that same row, "auto frequency and severity pressure" is listed as an "unfavorable factor[]." Under reflection in plan targets, it states "[b]alancing auto growth goals against actions to offset anticipated loss cost pressures."

¶ 36    We are not persuaded that exhibit 12 supports the inference that the outside directors knew that the 2014 10-K contained a false or misleading disclosure regarding the cause of the increase in claim frequency in October and November 2014. To begin, in both the second amended complaint and her brief on appeal, Biefeldt simply states, without explanation, that the phrase "actions to offset anticipated loss cost pressures" refers to "underwriting standards." But we are not required to accept as true mere conclusions unsupported by specific facts. See *Borcia v. Hatyina*, 2015 IL App (2d) 140559, ¶ 20.

¶ 37    That said, even accepting Biefeldt's characterization of the phrase in exhibit 12, the mere fact that one presentation to the board referenced underwriting standards and an increase in claim frequency in the same slide does not support a reasonable inference that the outside directors knew the growth strategy was the true cause of the increase in automobile claim frequency experienced in the fourth quarter of 2014. Biefeldt's argument to the contrary rests on her assertion that "it is illogical" to infer that Allstate would correct an increase in claims frequency caused by precipitation by taking underwriting actions, and therefore, the outside directors must have known the true cause was the growth strategy. Setting aside the question of whether Biefeldt is correct that such an action would be illogical, she is forgetting one crucial detail: the allegedly false disclosure in the 2014 10-K attributed the increase in claim frequency to precipitation *and* an

increase in miles driven cause by improved unemployment rates. Biefeldt makes no allegation that leveraging changes in underwriting standards to address the latter factor would be similarly illogical. "[T]he principle that all possible inferences and interpretations of the facts are to be drawn in favor of the [nonmoving party] is not triggered by conclusory and incomplete allegations. *Northbrook Bank & Trust Co. v. 2120 Div. LLC*, 2015 IL App (1st) 133426, ¶ 26.

¶ 38 Biefeldt's final contention with regard to the disclosure in the 2014 10-K is that we can infer that the outside directors knew that the growth policy was behind the increase in claim frequency because it concerned Allstate's "core business." In making this argument, Biefeldt acknowledges that "the core operations doctrine" is insufficient on its own to demonstrate a director's knowledge, but she contends that she has plead sufficient additional facts to infer that the outside directors had the requisite knowledge. The defendants respond that invoking the core operations doctrine in a shareholder derivative context is contrary to Delaware law. We need not decide if the core operations doctrine is compatible with Delaware law because we have already rejected Biefeldt's contention that she has plead sufficient additional facts to infer that the outside directors had the requisite knowledge.

¶ 39 Thus, after review, we find that Biefeldt has failed to plead with particularity that the outside directors knew the disclosure in the 2014 10-K attributing the increase in claim frequency to external factors was false. The exhibits attached to the second amended complaint, which form the entire basis for Biefeldt's claim, do not contain any information presented to the outside directors that is in conflict with the disclosure that precipitation and economic conditions were behind the specific increase in claim frequency that occurred in October and November 2014. At most, the second amended complaint alleges that the outside directors knew that there was an

unspecified amount of risk associated with Allstate's strategy to grow policies-in-force and that Allstate experienced an increase in claim frequency in October and November 2014 that Allstate's management was publicly attributing to external factors. Such an allegation is insufficient to support an inference that the directors faced a substantial likelihood of personal liability for *knowingly* making a false disclosure. Moreover, public statements made by Allstate's management two weeks before the 2014 10-K was filed indicate that an internal study concluded that external factors, not the growth strategy, were the cause of the claim frequency increased it was experiencing. We reiterate that, according to Delaware law, Biefeldt was required to plead, with particularity, what information the outside directors knew that contradicted the statement in the 2014 10-K and when they learned of it. We conclude that she has not done so. Accordingly, we find that the second amended complaint failed to allege sufficient facts that the outside directors faced a substantial likelihood of liability by knowingly disseminating false information in Allstate's 2014 10-K.

¶ 40 Biefeldt's next argument is that the second amended complaint adequately pleaded that a pre-suit demand would have been futile because the four outside directors who also served on Allstate's Audit Committee—Sprieser, Crawford, Mehta, and Eskew (the audit directors)—face a substantial likelihood of liability due to their role in formulating Allstate's earnings-related disclosures, two of which falsely attributed the increase in claims frequency to external factors when the audit directors knew that growth in policies-in-force was the true cause. Specifically, Biefeldt cites to the earnings-related disclosures made on February 4-5, 2015, and May 5-6, 2015.

¶ 41 The defendants respond that the mere fact that the audit directors served on the audit committee does not, alone, suggest sufficient involvement in the preparation of the allegedly false

disclosures, which is required to show that the audit directors face a substantial likelihood of personal liability. The defendants also argue that Biefeldt failed to allege that the audit directors were provided with information alerting them that the disclosures were, in fact, false.

¶ 42    The defendants are correct in their assertion that the mere fact that the audit directors were members of the committee charged with reviewing the disclosures does not, alone, support a reasonable inference that they prepared the disclosure, or had knowledge that it contained allegedly false information. A director's membership on a committee that is charged with reviewing and ensuring the accuracy of disclosures does not allow the court to infer the director's liability based on this responsibility alone because liability is not measured by the "aspirational standard" established by internal delegations of oversight responsibilities. *See In re Citigroup*, 964 A.2d at 134. Rather, to show that a director faces a substantial likelihood of liability for a breach of the duty of disclosure, the plaintiff must allege particularized facts that "reasonably suggest sufficient board involvement in the preparation of disclosures" and that the directors "had knowledge that any disclosures or omissions were false or misleading ***." *Id.* at 135. Therefore, we must examine the second amended complaint to determine whether it included sufficient facts to reasonably suggest the audit directors were involved in the preparation of the disclosures and that they had knowledge that the disclosures were false or misleading.

¶ 43    The first disclosures cited in the second amended complaint occurred on February 4-5, 2015, and which we have previously discussed. As mentioned above, on February 4, 2015, Allstate issued a press release announcing its fourth quarter 2014 results. In the press release, Allstate acknowledged that it experienced an increase in automobile claim frequency in October and November 2014, and it attributed the increase to precipitation in select markets and general

economic trends. Then, the next day, Wilson and Winter held a conference call with shareholders to discuss Allstate's 2014 fourth quarter earnings. As described above, Wilson and Winter were asked about the increase in automobile claim frequency and revealed that Allstate had studied the increase and determined that precipitation in select areas and miles driven were responsible, not its growth strategy.

¶ 44    Biefeldt alleges that these disclosures were "formulated" by the audit directors. To support her claim that the audit directors formulated the February 2015 disclosures, Biefeldt points to the allegations in the second amended complaint regarding Allstate's Audit Committee Charter. The relevant passages quoted in the second amended complaint show that the audit committee is responsible for (1) reviewing Allstate's annual audited and quarterly financial statements and (2) discussing Allstate's processes for providing financial information and earnings-related guidance to analysts, including the types of information to be disclosed and types of presentations to be made. Thus, Biefeldt contends, the audit directors "had an integral role in formulating the underlying earnings-related disclosures." We disagree.

¶ 45    The only allegations in the second amended complaint that Biefeldt cites to support her contention are the allegations that the audit committee *reviews* Allstate's quarterly financial statements and discusses the *processes* for providing financial information and earnings-related guidance to analysts. None of these allegations suggests that the audit directors played any part in formulating or preparing any of the allegedly false disclosures. It is not alleged that the February 4, 2014 press release is a financial statement that the audit directors drafted or even reviewed. Nor is there anything in the second amended complaint to suggest that the audit directors were in any way responsible for the comments made by Wilson and Winter on the February 5, 2015 conference

call or participated in the call in any fashion. Accordingly, we find that Biefeldt failed to plead that the audit directors faced a substantial likelihood of liability for violating their duty of loyalty. See *In re Citigroup,* 964 A.2d at 134 (finding that the plaintiff failed to plead sufficient facts to establish that directors faced a substantial likelihood of liability where the complaint alleged only that the directors reviewed the allegedly false financial statements pursuant to their responsibilities under the company charter and did not alleged that they played a role in preparing the disclosures); see also *In re Accuray, Inc. Shareholder Derivative Litigation*, 757 F. Supp. 2d 919, 929 (N.D. Cal. 2010) (finding that allegations that directors served on the committee responsible for reviewing and discussing earnings-related disclosures was insufficient to establish that the directors faced a substantial likelihood of liability for false statements made in earnings disclosure).

¶ 46　Moreover, even if we were to find that the second amended complaint pleaded sufficient facts to suggest that the audit directors prepared the allegedly false disclosure, Biefeldt was still required to plead with particularity facts to support a reasonable inference that the audit directors knew that the disclosures were false, which she cannot do. Her entire argument in that regard is virtually identical to the one she made with regard to the 2014 10-K. And we have already rejected that argument. Accordingly, we find that Biefeldt failed to plead sufficient facts in the second amended complain to establish that the audit directors faced a substantial likelihood of liability for the February 2015 disclosures.

¶ 47　The next disclosures cited in the second amended complaint occurred on May 5-6, 2015, when Allstate released its 2015 first quarter earnings. On May 5, 2015, Allstate issued a press release that reported "[a]uto losses" were elevated in the first quarter due to "seasonal winter

weather and higher non-weather levels of frequency and severity." On May 6, 2015, Wilson and Winter participated in a conference call with analysts and shareholders. During this call, Winter reiterated that "frequency pressure is a combination of miles driven and weather" and that "miles driven was about three times as influential as weather." Winter went on to assert that Allstate's management "did a very intense deep dive" to ensure that the increase in frequency was "externally driven" and they concluded that the increase was "primarily" due to "miles driven."

¶ 48    Just as with the February 2015 disclosures, we conclude that the second amended complaint failed to plead sufficient facts to suggest that the audit directors had any role in formulating or preparing the above disclosures. There are no allegations that the audit directors were involved in any fashion with the May 5, 2015 press release or the May 6, 2016 conference call. That said, even if we were to find that the second amended complaint pleaded sufficient facts to establish that the audit directors formulated the May 2015 disclosures, Biefeldt was still required to plead sufficient facts that the audit directors knew the information in the May 2015 disclosures to be false. We conclude that she has failed to do so.

¶ 49    Biefeldt relies primarily on two exhibits attached to the second amended complaint as support for her claim that the audit directors knew the May 2015 disclosures were false. The first is exhibit 14, which is a slide presentation Shebik made on April 9, 2015, to a joint meeting of the board and the risk and return committee. One slide from the presentation defined the term "severe weather risk" as including "all catastrophe losses excluding hurricane and earthquake events." Biefeldt next cites to exhibit 15, which is a copy of the minutes of the April 10, 2015 meeting of the board, which indicates that Shebik told the board that, although claim frequency was high, "catastrophe losses were below plan." According to Biefeldt, it is reasonable to infer from these

two exhibits that the audit directors knew that weather could not be causing the increase in claims frequency because the phrase "severe weather risk" includes all catastrophe losses (except hurricane and tornados) and catastrophe losses were down.

¶ 50    Even if we were to accept Biefeldt's characterization of exhibits 14 and 15, her argument nevertheless fails because she fails to account for exhibits attached to the second amended complaint from meetings occurring closer to the date of the objected to disclosures: exhibits 16 and 17. Exhibit 16 is a slide from a presentation entitled "April 9-10, 2015 Board Meeting summary," and it states that the decline in Allstate's "auto profitability" was down "due to increased frequency and severity" resulting from "overall industry trends reflecting increased economic activity." Exhibit 17 is a copy of slides from a presentation given by Eric Ferren, a member of Allstate's management, to the Audit Committee on May 1, 2015. The title of that presentation was "Disclosures to Review – A Guide to Significant Disclosures." Relevant here, a slide from that presentation states that automobile claims frequency was up in the first quarter of 2015 and that the increase occurred "in the last month of the quarter and was impacted by adverse winter weather experienced predominately in the east. Earlier months compared favorably due to adverse winter weather experienced in 2014." In other words, the most recent information presented to the audit directors was exactly the same information that was included in the May 2015 disclosures: winter weather and increased economic activity caused the increase in automobile claims frequency later in the quarter. *Steenes*, 2014 IL App (1st) 120719, ¶ 16 ("Where an exhibit contradicts the allegations in a complaint, the exhibit controls."). Thus, we cannot say that it is reasonable to infer that the audit directors knew the May 2015 disclosures attributing the increase in claims frequency to external factors was false when they were told the exact same

information by Allstate's management in the days leading up to the disclosure. See *In re Citigroup*, 964 A.2d at 132 ("[D]irectors of Delaware corporations are fully protected in relying in good faith on the reports of officers and experts.").

¶ 51 Perhaps, as Biefeldt insists, some of the audit directors suspected that the growth strategy was at the true cause of the increase in claims frequency even though Allstate's management expressly told them otherwise. But that is not a *reasonable* inference to draw from the facts alleged in the second amended complaint given the exhibits showing the audit directors were told the weather and other external factors were the cause. We, therefore, find that Biefeldt's allegations do not meet the stringent standard of factual particularity required under Rule 23.1. Consequently, she has failed to allege that a pre-suit demand would have been futile.

¶ 52 Biefeldt's final contention is that a pre-suit demand on the board is excused because the outside directors face a substantial likelihood of liability "for failing to correct" the various false disclosures Allstate made throughout 2014 and 2015 regarding the cause of the increase in automobile claims frequency when they learned the true cause was the growth strategy. However, we have reviewed the second amended complaint, and we can find no allegation similar to the one Biefeldt now raises on appeal. The second amended complaint lists 11 reasons why demand should be excused, including allegations that several outside directors "participated in, approved and/or permitted the wrongs," "allow[ed]" the improper statements, and "caus[ed] Allstate to make false and misleading statements." But there is no allegation that a director faced a substantial risk of liability on account of their failure to correct statements they did not know to be false at the time they were made but which they later learned were false. In fact, Biefeldt's allegations below have consistently been that the outside directors knew the disclosures were false at the time they were

made. A party "cannot properly raise a new theory for recovery for the first time on appeal." *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 88 (citing *Federal Insurance Co. v. Turner Construction Co.*, 277 Ill. App. 3d 262, 268 (1995)). We conclude, therefore, that we cannot consider this issue because Biefeldt did not include any such allegation in the second amended complaint.

¶ 53    In sum, we find that Biefeldt failed to plead with particularity sufficient facts alleging that the outside directors face a substantial likelihood of personal liability for violating their duty of loyalty. It follows then that Biefeldt has also failed to establish that at least half of the board as constituted when she filed the second amended complaint were incapable of exercising independent and disinterested business judgment. Consequently, she was not excused from making a pre-suit demand. Therefore, the circuit court did not err when it dismissed the second amended complaint.

¶ 54    For the foregoing reasons, we affirm the judgment of the circuit court dismissing this action.

¶ 55    Affirmed.

| | |
|---|---|
| **No. 1-21-0336** | |

| | |
|---|---|
| **Cite as:** | DONNA BIEFELDT and IBEW LOCAL 98 PENSION FUND, Derivatively on Behalf of THE ALLSTATE CORPORATION, Plaintiffs-Appellants, v. THOMAS J. WILSON, et al., Defendants-Appellees, and THE ALLSTATE CORPORATION, a Delaware corporation, Nominal Defendant |

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 17 CH 10676, 18 CH 04793<br>Honorable Anna M. Loftus, Judge, presiding. |

| | |
|---|---|
| Appellant Attorneys: | ROBBINS GELLER RUDMAN & DOWD LLP FRANK A. RICHTER 200 South Wacker Drive, 31st Floor Chicago, IL 60606 Telephone: 312/674-4674 |
| | ROBBINS GELLER RUDMAN & DOWD LLP TRAVIS E. DOWNS III STEVEN F. HUBACHEK 655 West Broadway, Suite 1900 San Diego, CA 92101 Telephone: 619/231-1058 |
| | ROBBINS LLP BRIAN J. ROBBINS STEPHEN J. ODDO 5040 Shoreham Place San Diego, CA 92122 Telephone: 619/525-3990 |
| Appellees Attorneys: | John J. Clarke, Jr.* DLA PIPER LLP (US) 1251 Avenue of the Americas New York, New York 10020 212.335.4500 *Admitted *pro hac vice* |
| | Kenneth L. Schmetterer Yan Grinblat Emily D. Gilman DLA PIPER LLP (US) 444 West Lake St., Suite 900 Chicago, Illinois 60606 312.368.4000 |